# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| JANE DOE,<br>    Plaintiff,<br><br>v.<br><br>TOWN OF SOUTH KINGSTOWN by and through its Treasurer/Finance Director ZACHARY SAUL; ROBERT C. ZARNETSKE and his successors solely in their capacity as Town Manager of the Town of South Kingstown; AIMEE REINER and her successors solely in their capacity as Director of Administrative Services of the Town of South Kingstown; and JOHN DOE DEFENDANTS 1-5<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 1:22-cv-441-JJM-LDA |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief Judge, United States District Court.

    Jane Doe has alleged hostile work environment, retaliation, and constructive discharge, under Title VII, during her employment with the Town of South Kingstown Police Department ("SKPD"). She also alleges negligent infliction of emotional distress (NIED), and violations of the Fourteen Amendment's Equal Protection Clause, the Rhode Island Civil Rights Act ("RICRA"), and the Rhode Island Whistleblower's Protection Act ("WPA"). ECF No. 3. Following discovery, the Defendants moved for summary judgment. ECF No. 20.

## I.    BACKGROUND

Ms. Doe was a dispatcher for SKPD for four years until she resigned from the position in July 2022.  For a portion of her employment, Ms. Doe worked full-time on third shift under the supervision of Lieutenant Scott Orton.  ECF No. 24 at 2.  She worked with Lt. Orton until July 2019, when he was placed on administrative leave due to another officer's complaints of misconduct.  ECF No. 21 at 1.  Five months later, when learning that Lt. Orton was returning to duty, Ms. Doe approached SKPD officers Lieutenant Montafix Houghton and Sergeant Bethany Dolock to report that Lt. Orton sexually harassed her between February 2019 to July 2019.[1]  *Id.*    The alleged sexual harassment involved Lt. Orton commenting on Ms. Doe's physical appearance, engaging in unwanted sexual touching, and making inappropriate sexual gestures toward her.[2] ECF No. 24 at 2.

Ms. Doe's complaint made its way up the SKPD chain of command, reaching Defendants Aimee Reiner (Director of Administrative Services), and Robert Zarnetske (Town Manager), who informed Chief Joseph Geabar.  ECF No. 24-2 at 3. Chief Geabar immediately placed Lt. Orton on administrative leave on December 16, 2019, pending an internal investigation of Ms. Doe's complaint.  ECF No. 21 at 2-3. That same day, Director Reiner met with Ms. Doe to gather more details about her

---

[1] Ms. Doe purportedly requested that her allegations remain confidential, but it is unclear to whom she made this request.

[2] As an example of the unwanted conduct, Ms. Doe detailed an instance in which Lt. Orton placed his head on her shoulder, breathed down on her neck, and whispered in her ear "you are lucky you are so pretty."  ECF No. 24 at 2; ECF No. 24-2 at 4.

complaint, in which Ms. Doe described multiple instances of inappropriate behavior from Lt. Orton. ECF No. 24-2 at 5-9. In the ensuing weeks, Director Reiner and SKPD Captain Joel Ewing-Chow, interviewed several SKPD officers and dispatchers to gather any evidence of Lt. Orton's alleged misconduct. *Id.* at 11-14. But before the investigation concluded, Lt. Orton voluntarily resigned from SKPD effective December 31, 2019. *Id.* at 3. Despite the resignation, the investigation pushed forward with Captain Ewing-Chow making efforts to interview Lt. Orton[3] and reviewing all chat log correspondence between Ms. Doe and Lt. Orton. *Id.* at 15.

At the end of the investigation, SKPD ultimately found that no employee witnessed the specific instances of harassment that Ms. Doe alleged. ECF No. 24-2 at 16. That said, SKPD did note that one employee, Sergeant Michael Bronson, reported observing an instance of sexual harassment in which Lt. Orton allegedly made a sexually explicitly hand gesture while looking into the dispatch area through a window. *Id.* However, Ms. Doe and other employees did not witness this gesture because it was done behind her back. *Id.* Nonetheless, based on Ms. Doe's harassment allegations, the investigation report included a recommendation that all employees: (1) receive workplace harassment training and (2) review all departmental and Town policies prohibiting such harassment. *Id.* at 17.

Amid the internal investigation, the details of Ms. Doe's complaints against Lt. Orton apparently became known after a letter from her attorney, presenting a claim

---

[3] Given Lt. Orton's resignation, SKPD could only request, but not compel Lt. Orton to submit to an interview for the investigation. ECF No. 24-2 at 16-17.

against the Town of South Kingstown ("South Kingstown"), was placed on the Town Council of South Kingstown's January 13, 2020 meeting agenda. ECF No. 27-3 at 2-3.; *see also* ECF No. 27 at 4-5. The letter was ultimately attached to the Town Council's publicly available meeting minutes, which noted that the Council unanimously authorized the claim and referred it to the relevant personnel. *See* ECF No. 27-3 at 2-3; ECF No. 24-4 at 12. Less than a week later, South Kingstown received an Access to Public Records Act (APRA) request from news media, inquiring about Ms. Doe and Lt. Orton's employment status. ECF No. 27-4. Director Reiner, in her capacity as Director of Administrative Services, promptly fulfilled the APRA request. *Id.*

Once the details of Ms. Doe's complaint became widespread knowledge, she encountered times when her colleagues laughed at and ridiculed her. ECF No. 24 at 7. In one instance—when SKPD members were made to attend sexual harassment training—she observed male members make snide comments, with one officer remarking "oh thanks a lot [Ms. Doe.]" ECF No. 24-5 at 8. Ms. Doe also learned that an officer told everyone at roll call to "tune in" to the next town hall meeting to see what happens—referring to her sexual harassment complaints. *Id.*

Moreover, Ms. Doe experienced some instances of discord with the SKPD in the period after she report Lt Orton. She took issue with SKPD's: (1) initial denial of her request to switch from third shift to second shift, (2) denial of her requests for time off on July 24, 2021, and July 28, 2021 to July 20, 2021, (3) handling of her complaints of a 911 caller sexually harassing her, and (4) alleged drunk driving

accusations against her.[4] ECF No. 24 at 1-4. Despite these issues, Ms. Doe continued to work as a dispatcher until she resigned in July 2022. Five months later, Ms. Doe filed this instant suit.

## II.    STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the boilerplate of the pleadings." *Quinn v. City of Bos.*, 325 F.3d 18, 28 (1st Cir. 2003). Taking the evidence in the light most favorable to the nonmoving party, the Court must grant summary judgment if the moving party can show that "no genuine dispute as to any material fact," and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is "genuine" if a reasonable jury could resolve it for the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Additionally, the moving party must have a right to judgment as a matter of law, which can be established if the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is a "drastic remedy" because it deprives the parties of their Seventh Amendment right to have their case tried by a jury. *Colman v. Faucher*, 128 F. Supp. 3d 487, 490 (D.R.I. 2015). It also serves as an important check on the parties: the nonmovant may not

---

[4] The Court will detail the circumstances surrounding these acts in its discussion of Ms. Doe's retaliation claims.

rely on "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation," but must produce "specific facts" to support their claims or defenses. *Theidon v. Harvard Univ.*, 948 F.3d 477, 494 (1st Cir. 2020) (citations and internal quotation marks omitted).

## III.  DISCUSSION

### A. Timeliness of Title VII Claims

The Defendants assert that they are entitled to summary judgment on Ms. Doe's Title VII discrimination claims because she "did not file a charge of discrimination with either the [Equal Employment Opportunity Commission ("EEOC")] or the Rhode Island Commission for Human Rights," thus failing to exhaust administrative remedies before filing such claims before the Court.  ECF No. 21 at 2-3.  Ms. Doe concedes that she did not comply with Title VII's administrative exhaustion requirements but argues that such a requirement is waived because the Defendants did not timely raise a failure to exhaust defense. ECF No. 24 at 9.  She acknowledges that the Defendants raised a failure to exhaust defense in their Answer but contends that they waited two years to advance that issue and seek dismissal on those grounds, thus waiving the defense. *Id.* at 10.

Generally, one alleging a Title VII violation "may not sue in federal court until [they] exhausted his administrative remedies." *Paulo v. Cooley, Inc.*, 686 F. Supp. 377, 382 (D.R.I. 1988) (citing 42 U.S.C. § 2000e-5).  The Court has outlined the claim-processing rules under Title VII, explaining that:

> Title VII requires a timely charge be filed with the Equal Employment
> Opportunity Commission ("EEOC") before a suit may be initiated in

> federal court.  If there exists an appropriate state agency, such as the Commission in Rhode Island, a discrimination charge must first be filed with that agency during which time, the EEOC's administrative jurisdiction is suspended for sixty days.  The purpose of the sixty day deferral is to provide the states with a limited opportunity to resolve discrimination claims locally before a plaintiff is permitted to seek administrative relief before the EEOC.  If the dispute is not settled within the sixty day period, the aggrieved employee must pursue his claim at the EEOC prior to initiating a suit in federal court.  In all events, the complaining employee must file with the EEOC within three hundred days after the [occurrence] of the alleged unlawful employment practice, 42 U.S.C. § 2000e–5(e), or lose the right thereafter to bring suit in federal court.

*Paulo*, 686 F. Supp. at 382 (citations omitted).  These claim-processing rules become "mandatory"—meaning courts must enforce the rules—only if a party properly raises an objection based on such rules.  *Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541, 549 (2019) (citing *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam)).  But a party forfeits an objection based on a mandatory claim-processing rule if they wait too long to raise that objection.  *Id.* (citing *Eberhart*, 546 U.S. at 15).

Here, there is no dispute that Ms. Doe did not file a charge asserting her Title VII claims with either the EEOC or the Rhode Island Commission for Human Rights.  And the Defendants have objected to these claims based on Ms. Doe's failure to comply a Title VII claim-processing requirement—administrative exhaustion.  Thus, whether the Court must enforce such a claims-processing requirement depends on whether the Defendants *timely* raised their failure to exhaust defense.

A review of the record reveals that the Defendants did timely raise their failure to exhaust defense.  In the Defendants' Answer, their first affirmative defense asserts "[t]he plaintiff has failed to exhaust her administrative remedies." ECF No. 13 at 5.

Then, in answering Ms. Doe's interrogatory as to the basis of that affirmative defense, Defendant Zarnetske explained "it is my understanding, that the [failure to exhaust defense] relates to plaintiff's failure to file a charge of discrimination with the Rhode Island Commission for Human Rights or EEOC prior to filing this lawsuit." ECF No. 27-1 at 7. This interrogatory answer was served about seven months after the Defendants raised the failure to exhaust defense in their Answer and over a year before the Defendants filed this Motion. Thus, not only did the Defendants timely raise their failure to exhaust defense in their first responsive pleading but they also disclosed the underlying basis for the defense to Ms. Doe well before filing this instant Motion. Accordingly, the Defendants have not forfeited their timely failure to exhaust defense.

Considering the Defendants properly raised their failure to exhaust defense the Court must enforce Title VII's administrative exhaustion requirement. *Fort Bend,* 587 U.S. at 549. Consequently, because Ms. Doe has failed to pursue her administrative remedies as Title VII requires, she "may not now bring [her] discrimination claim in federal court." *Paulo,* 686 F. Supp. at 382–83. Thus, the Court GRANTS the Defendants' Motion for Summary Judgment on the Title VII claims (Count IV).

### B. Discrimination Claims Under RICRA

The bases for Ms. Doe's RICRA claims (Count II) are a bit jumbled. In an interrogatory answer, Ms. Doe asserted that Lt. Orton allegedly subjecting her to sexual harassment was a RICRA violation. ECF No. 21-1 at 6-7. As a result, the

Defendants argued that Ms. Doe's RICRA claims are time-barred under the Act's three-year statute of limitations because Lt. Orton's alleged misconduct toward her occurred between February 2019 and July 2019—more than three-years before she filed her December 14, 2022 complaint. ECF No. 21 at 3. However, in her Opposition to this Motion, Ms. Doe appears to clarify that the RICRA violations she asserts arise from the Defendants allegedly subjecting her to discrimination and retaliation due to her reporting Lt. Orton's alleged sexual harassment. ECF No. 24 at 10-14. In response, the Defendants argue that Ms. Doe "fails to articulate the basis on which she claims to have been discriminated against" as required to form the basis of a claim under RICRA. ECF No. 27 at 2. Rather, Defendants contend that Ms. Doe's claim that they discriminated against her for making a report against Lt. Orton is a claim that may, more appropriately, rise under the WPA. *Id.* The Court will proceed under Ms. Doe's latter legal theory for the RICRA violations.

Ms. Doe's claims of unlawful discrimination under RICRA lack support. RICRA proscribes discrimination based on race, color, religion, sex, disability, age, or country of ancestral origin. R.I. Gen. Laws § 42–112–1. Ms. Doe appears to base her discrimination claims on allegations that she was treated differently than other SKPD employees after she reported Lt. Orton's conduct. ECF No. 24 at 11. Further, Ms. Doe alleges that Defendants Zarnetske and Reiner are implicated in discriminatory conduct against her, apparently arising from how South Kingstown's personnel department handled the investigation into her sexual harassment claims. *Id.* at 12-13. But in asserting these claims, Ms. Doe does not submit any evidence

to support the basis on which the Defendants illegally discriminated against her. Merely asserting discrimination without articulating and supporting with evidence (even inferential), the *basis* for such discrimination—such as race, sex, and age—is not enough to make out a RICRA discrimination claim. *See Tomaiolo v. Transamerica Corp.*, 131 F. Supp. 2d 280, 298-99 (D.R.I. 2001), *aff'd as modified sub nom. Tomaiolo v. Mallinoff*, 281 F.3d 1 (1st Cir. 2002) (refusing to extend RICRA's protections of the discrete classifications identified in its text to taxpayers experiencing general disparate treatment). Thus, Ms. Doe's RICRA discrimination claim fails as a matter of law.

### C.    Retaliation Claims

Next, Ms. Doe brings forth retaliation claims under RICRA and WPA. To succeed on a retaliation claim, a plaintiff must prove that "(1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity." [5] *Stratton v. Bentley Univ.*, 113 F.4th 25, 41–42 (quoting *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 (1st Cir. 2007)). The Supreme Court has held that this is a "but-for" test. *Carvalho*, 573 F. Supp. 3d at 645 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)) ("a plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action.").

---

[5] Both RICRA AND WPA require plaintiffs to prove the same three elements for their retaliation claim, which are borrowed from the standards applicable to Title VII suits. *See Ryder v. Pearson Educ., Inc.*, 486 F. Supp. 3d 489, 509 (D.R.I. 2020).

The three-part burden-shifting framework found in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) applies to retaliation claims, meaning that upon the plaintiff making a prima facie case of retaliation, the burden shifts to the defendant to provide a genuine "non-retaliatory reason for its employment decision." *Stratton,* 113 F.4th at 42 (quoting *Abril-Rivera v. Johnson,* 806 F.3d 599, 608 n.10 (1st Cir. 2015)).  If the defendant meets their burden, then the burden shifts back to the plaintiff to prove that the defendant's reason is pretext and "that retaliatory animus was the real motivating factor."  *Id.* (quoting *Abril-Rivera,* 806 F.3d at 608 n.10). Pretext may be shown based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," or where the reason is simply "unworthy of credence." *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 168 (1st Cir. 1998).

### a.    Retaliation Claims Under RICRA

Ms. Doe alleges that the Defendants violated RICRA upon retaliating against her for reporting Lt. Orton's alleged misconduct. *See* ECF No. 24 at 10-11. Starting off, Ms. Doe satisfies the first element of the retaliation prima facie case because there is sufficient proof that she engaged in protected activity when she reported Lt. Orton's alleged sexual harassment toward her to South Kingstown. *See Lynch v. Orthopedic Grp., Inc.,* No. C.A. 98-121L, 1998 WL 34101009, at *2 (D.R.I. Oct. 30, 1998) ("Sexual harassment is punished by the well-honed civil rights provisions of . . . RICRA . . . ."). The analysis now turns to whether Ms. Doe suffered an adverse employment action.

To establish an adverse employment action, a plaintiff must show that her employer engaged in a "materially adverse" action—an action that "could well

dissuade a reasonable worker from making or supporting a charge of discrimination." *Stratton*, 113 F.4th at 43 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). This standard is objective, and therefore an "employee's subjective reaction to a claimed act of retaliation is not determinative." *Lima v. City of E. Providence*, 17 F.4th 202, 209 (1st Cir. 2021) (citing *Burlington*, 548 U.S. at 68-69). To be material, a retaliatory action must cause significant, rather than trivial, harm. *Burlington*, 548 U.S. at 68. Generally, "petty slights, minor annoyances, and simple lack of good manners" are not materially adverse actions. *See id.* Ms. Doe points to several incidents between 2020 and 2021 to support these retaliation claims to assert that the Defendants subjected her to adverse employment actions in retaliation for reporting Lt. Orton. *See* ECF No. 24 at 10-12. The Court will address each incident in turn.

### i. Denial of Employment Benefits

First, Ms. Doe asserts that she was wrongfully denied employment benefits when: (1) her request to switch from third shift to an available second-shift position was denied in contradiction of her employment contract terms "which explicitly afforded her the opportunity to switch . . . to second shift," and (2) high-ranking officers denied her four time-off requests for late-July 2021 for reasons "fabricated" and "contrary to the SKPD's written protocol." *Id.* at 5-6, 11; ECF No. 24-5 at 12-13.

As to the time-off requests, Ms. Doe states that the then-SKPD policy allowed dispatchers to take a day off as long as there was one dispatcher present. ECF No. 24 at 5. Ms. Doe outlines that her time-off request for July 24, 2021, was denied because

no one took her spot. *Id.* She alleges this denial contradicted the SKPD policy—apparently because there was still going to be one dispatcher present for that shift. *Id.* Ms. Doe asserts that when she found someone willing to take her shift, a dispatcher told her she was not allowed to directly speak to the officer in charge of non-sworn personnel, and that she needed to follow the chain of command. *Id.* at 6. Ms. Doe contends that this demand also contravened SKPD policy indicating that dispatchers were not in the chain of command. *Id.* Overall, Ms. Doe argues that this situation exhibits the arbitrary rules the Defendants made up on the spot to prevent her from taking time off on July 24th and July 28th to July 30th. *Id.*

Even viewing the evidence in a light most favorable to Ms. Doe, a reasonable juror could not infer that the Defendants' alleged denial of her single shift switch request was an adverse employment action. First, Ms. Doe has set forth little to no facts surrounding the circumstances of the Defendants denying her request to switch to second shift that could help a factfinder assess the materiality of any harm from such a denial.[6] She merely states that the denial directly contravened her employment contract terms that explicitly afforded her the "opportunity to switch to

---

[6] The Supreme Court has highlighted that the impact of workplace behavior often depends on the surrounding circumstances, noting as an example that "[a] change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-aged children." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). What Ms. Doe is missing is facts showing that the denial of her shift change was more than a trivial, non-actionable minor annoyance. For example, if Ms. Doe provided copy of her employment contract showing that she had a right of first refusal to an open shift position or that she was unconditionally entitled to switch shifts upon applying, that could have helped support an inference that she was wrongfully denied a material employment benefit.

second shift." ECF No. 24 at 5. But nothing suggests that she was not afforded the opportunity to switch shifts, as Ms. Doe was permitted to submit a request for the open second shift. An *opportunity* to do something does not necessarily grant one *entitlement* to do something, so the fact that Ms. Doe switch shift request was initially denied does not contradict the terms of her contract.

Moreover, the record reveals that Ms. Doe eventually was permitted to switch to second shift. Ms. Doe alludes to such a switch when detailing the Defendants' denial of her time-off requests noting that she "put in for *second shift* off on July 24, 2021." ECF No. 24 at 5 (emphasis added). Further, the Defendants' retort confirms that such a switch occurred, as they explain that Ms. Doe's request was delayed to allow the training of her third shift replacement, after which Ms. Doe was transferred to second shift. ECF No. 27 at 4. Thus, even if Ms. Doe's contract entitled her to switch to second shift, her eventual transfer to that shift satisfies such an entitlement. While a delay in the shift change must have been a "minor annoyance," Ms. Doe has not alluded to any facts that suggest that such a delay caused significant harm such that a reasonable juror to infer that it constituted an adverse employment action. *Burlington*, 548 U.S. at 68.

As to Ms. Doe's time-off requests, a reasonable jury could not infer that the denial of those requests constituted an adverse employment action.[7] A mere denial

---

[7] Even if a reasonable jury could infer that the denial of Ms. Doe's time-off requests constituted an adverse employment action, Ms. Doe would fall short on showing causation. Given that there is an eighteen-month gap between when Ms. Doe reported Lt. Orton and when she had her time-off requests denied, Ms. Doe cannot rely on temporarily proximity to support an inference of causation between

of certain days off generally "does not rise above the level of minor annoyances." *Sellers v. U.S. Dep't of Def.*, 654 F. Supp. 2d 61, 109 (D.R.I. 2009). It may have been frustrating for Ms. Doe to search for shift coverage, particularly when SKPD policy led her to believe that her shift would be sufficiently staffed without her. Still, the denial of these time-off requests, without any showing that there was an absolute bar against Ms. Doe taking any time off falls short of illustrating an adverse employment action.[8]

### ii. Alleged Release of the Details of Ms. Doe's Complaints to Media.

Second, Ms. Doe alleges that the Defendants and the SKPD knowingly released the details of her sexual harassment complaints—including revealing her name—to news media despite her asserting her right to confidentiality that she was entitled to under SKPD policy. ECF No. 24 at 11-12. Ms. Doe asserts that the Defendants' failure to keep her complaints private intensified the alleged hostile work environment because her SKPD coworkers and South Kingstown employees now

---

her protected activity and the time-off denials. *See Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 25 (1st Cir. 2004) ("Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity."). And Ms. Doe has not set forth any other facts that could allow a reasonable causation inference considering the large temporal gap between her protected conduct and the time-off request denials.

[8] Ms. Doe focuses much on the fact that she was told she could not directly speak with the officer in charge regarding the shift coverage she secured for her time-off requests. But a key fact Ms. Doe never set forth is whether she ultimately communicated her shift coverage to the officer in charge—indirectly or directly—and if the officer still denied her time-off requests considering such shift coverage. Those facts, if presented, could allow a reasonable jury to infer that the Defendants were essentially denying Ms. Doe *any* time off—a material adverse act that could well dissuade a reasonable worker from making a discrimination charge.

"knew the details of her personal matters." *Id.* at 12. She states that when her allegations were made public, she was "laughed at" and when SKPD members were made to attend sexual harassment training, male members would make snide comments, with one officer remarking "oh thanks a lot [Ms. Doe]." ECF No. 24-5 at 8. She also contends that after the news went public, an officer told everyone at roll call to "tune in" to the next town hall meeting to see what happens. *Id.*

Ultimately, Ms. Doe has not set forth sufficient facts for a reasonable jury to infer that the Defendants subjected her to an adverse employment action via the alleged publicizing of her sexual harassment complaint. Even viewing the facts in a light most favorable to Ms. Doe, the record refutes her assertions that the Defendants disclosed her name and details of her complaint to the media. Rather, the record reveals that in late-December 2019, Ms. Doe's then-counsel wrote a letter to the South Kingstown Town Council, presenting Ms. Doe's claim against the Town under R.I. General Laws § 45-15-5.[9] ECF No. 27-2. Thus, that letter was then placed on the agenda of South Kingstown Town Council meeting, where it referred the matter to the Town's: (1) Special Legal Counsel for Labor Management Issues, (2) Solicitor, and (3) Insurer.[10] ECF No. 27-3 at 2-3.; *see also* ECF No. 27 at 4-5. The only information

---

[9] Rhode Island General Laws § 45-15-5 provides that every person who has a claim against any town or city for any matter shall present the claim to the town council of the town.

[10] The claim presentment letter Ms. Doe's attorney sent to the Town Council disclosed her name and detailed the nature of her allegations against Lt. Orton. *See* ECF No. 27-2. Still, nothing suggests that the Town Council disclosed the presentment letter for reasons other than to follow their meeting procedures. The record of the relevant Town Council meeting minutes affirms that it is customary practice for the Council to disclose claims presented against South Kingstown and

South Kingstown released to the media was Ms. Doe's *employment status*, under the APRA request.    *See* ECF No. 27-4.    ("[Ms. Doe's] employment status is active employee, full time Dispatcher.").    There are no facts indicating that the Defendants intentionally or knowingly released her name and complaint to the media.    Rather, it appears that Ms. Doe's attorney's claim presentment to the Town Council was ultimately how news media learned of her identity and allegations against Lt. Orton.

### iii. Alleged Failure to Adequately Investigate Sexually Harassing 911 Calls

Ms. Doe claims the Defendants further retaliated against her when they purportedly failed to adequately investigate and act on her allegations that a citizen was using the 911 system to call her personally and harass her.    *Id.*    Ms. Doe asserts that the Town only requested to review the 911 call logs, but neither made any further investigation into the matter nor created any formal written determination related to her complaints.    ECF No. 24 at 8.

Contrary to Ms. Doe's assertions, the record reveals that there was action taken to address the harassing 911 calls.    An SKPD Incident Report and Memorandum illustrates that SKPD officers twice went to the residence of the person making the harassing 911 calls, where they confronted the caller about misuse of 911 and advised him of the consequences of such misuse, including formal charges.    *See* ECF No. 27-5 at 2-10.    But Ms. Doe appears to take issue with the fact that South

---

refer such claims to the appropriate parties.    *See* ECF No. 27-3 at 2-3.    The meeting minutes illustrate that Ms. Doe's claim was one of *two* claims placed on the meeting agenda and referred to the relevant town personnel.    *See id.*

Kingstown made no formal investigation or report into the incident despite Town policy purportedly requiring a thorough investigation. ECF No. 24 at 7-8. But she fails to indicate what material harm occurred from such an alleged failure to formally investigate her claims.[11] There is no evidence that Ms. Doe was subject to continued harassment from the 911 caller after SKPD addressed the issue. Thus, Ms. Doe fails to set forth sufficient facts for a reasonable jury to infer the Defendants' purported failure to adequately investigate constituted an adverse employment action.

### iv. Alleged False Accusations of Drunk Driving.

Lastly, Ms. Doe asserts that SKPD members falsely accused her of drunk driving after she was involved in a minor car accident following a night out with her husband. ECF No. 24 at 8. She explains that, despite her husband being the driver that night, SKPD members accused her of causing the car accident and lying about the who was driving. *Id.*

Ms. Doe has not set forth sufficient facts to permit a reasonable jury to infer that the SKPD alleged false drunk driving allegations against her constituted an adverse employment action. It may have been offensive for SKPD members to falsely suggest Ms. Doe was inebriated and caused a car accident. That said, nothing suggests that such an allegation constituted more than a trivial harm or a minor annoyance to Ms. Doe. The police report for the relevant car accident reveals that

---

[11] This is not to undermine Ms. Doe's disappointment with South Kingstown's approach to investigating the 911 incident. That said, Ms. Doe does not make clear what material harm resulted from SKPD being the entity that made the formal written determination about these complaints rather than South Kingstown.

the reporting SKPD officer ultimately denoted the car's driver as "not distracted" and in an "apparently normal" physical condition. ECF No. 27·6 at 4. Thus, the police report does not reflect suspicions of inebriation toward any person involved in the accident. Accordingly, even if a SKPD member verbally espoused any drunk driving allegations toward Ms. Doe, there are no facts for a reasonable jury to infer that any significant harm flowed from such accusations.

Ultimately, Ms. Doe's RICRA retaliation claim fails because she has not set forth any facts sufficient for a reasonable jury to infer that the Defendants subjected her to an adverse employment action in retaliation for her reporting Lt. Orton. Accordingly, the Court GRANTS the Defendants' Motion for Summary Judgment on the RICRA retaliation claim (Count II).

### b.    Retaliation Claims Under WPA

The allegations supporting Ms. Doe's WPA retaliation claims are essentially the same as the ones she raised for her RICRA retaliation claims. For reasons explained above, the RICRA retaliation arguments she repeats for her WPA retaliation claims fail because Ms. Doe has not set forth sufficient facts for a reasonable jury to infer that an adverse employment action occurred. That said, Ms. Doe does add that her July 2022 resignation constituted an adverse employment action because it was a constructive discharge. ECF No. 24 at 19.

An employee's resignation may constitute an adverse employment action by constructive discharge only when his working conditions were so intolerable that a reasonable person "would have felt compelled to resign." *Stratton*, 113 F.4th at 39

(quoting *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002)).   The constructive discharge standard is an objective one, meaning that an employee's subjective beliefs, no matter how sincere, do not govern. *Id.* (citing *Gerald v. Univ. of P.R.*, 707 F.3d 7, 25 (1st Cir. 2013)).   Thus, "it is not enough that a plaintiff suffered 'the ordinary slings and arrows that workers routinely encounter in a hard, cold world.'"   *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 45 (1st Cir. 2003) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000)) (internal quotations omitted).

If, after such intolerable treatment, "a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged." *Harris v. City of Providence*, 588 F. Supp. 3d 211, 217 (D.R.I. 2022) (quoting *Landrau-Romero v. Banco Popular De P.R.*, 212 F.3d 607, 613 (1st Cir. 2000)).   A six-to-seven-month period between the last harassment or discrimination incident an employee experienced, and the employee's ultimate resignation has been found as too long to support a constructive discharge claim.  *See Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991) (six months); *see also Landrau-Romero*, 212 F.3d at 613 (seven months).

Here, Ms. Doe appears to argue that she was constructively discharged because her workplace became intolerable after the Defendants purportedly created a retaliatory hostile work environment.  ECF No. 24 at 19.  She points to the alleged adverse employment actions that she raised under her RICRA retaliation claims as the actions forming the retaliatory hostile work environment.  But even if those acts

did create working conditions so intolerable that a reasonable person would feel compelled to resign (which the Court has found they do not), there is a fatal time-gap between the last incident of retaliation and Ms. Doe's ultimate resignation. Based on Ms. Doe's chronology of events, it appears that the last incident of alleged retaliation occurred in July 2021, when her request for time off was denied. Ms. Doe does not allege that any other retaliatory acts occurred between July 2021 until her July 2022 resignation. There is thus a year gap between the last alleged retaliation incident and Ms. Doe's resignation—a temporal gap that is too long under these circumstances to support a constructive discharge claim. *Harris*, 588 F. Supp. 3d at 217.

Because Ms. Doe has neither provided sufficient evidence of constructive discharge nor any other basis of adverse employment action, Ms. Doe cannot make a prima facie case for retaliation under WPA. Accordingly, the Court grants the Defendants Summary Judgment Motion on the WPA retaliation claim (Count I).

### D. NIED

Ms. Does next seeks relief for NIED. Only two classes of persons may bring claims for NIED: those within the zone-of-danger who are physically endangered by the acts of a negligent defendant, and bystanders related to a victim who they witness being injured. *Shannahan v. Moreau*, 202 A.3d 217, 229 (R.I. 2019) (citing *Gross v. Pare,* 185 A.3d 1242, 1246 (R.I. 2018)). A plaintiff is within the zone-of-danger if they sustain a physical impact or are "placed in immediate risk of physical harm" by a defendant's negligent conduct. *Sawyer Bros, Inc. v. Island Transporter, LLC*, 887 F.3d 23, 38 (1st Cir. 2018) (citing *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 548

(1994)). Plaintiffs within the zone-of-danger must also, because of experiencing the accident, suffer "serious emotional injury that is accompanied by physical symptomatology." *Perrotti v. Gonicberg*, 877 A.2d 631, 637 (R.I. 2005) (citing *Marchetti v. Parsons*, 638 A.2d 1047, 1052 (R.I. 1994)).

Here, Ms. Doe precedes under the "zone-of-danger" theory, arguing that the Defendants' acts and omissions created a hostile and retaliatory work environment, thus placing her in the zone-of-danger repeatedly each day that she reported for work at the SKPD. ECF No. 24 at 14. But this NIED claims fails as a matter of law because Ms. Doe does not set forth evidence that Defendants' purported acts or omissions placed her in a zone of *physical* danger. *See Shannahan*, 202 A.3d at 230. She does not submit or even outline any facts showing that the hostile and retaliatory work environment that the Defendants allegedly created caused her to sustain a direct physical impact[12] or placed her in an immediate risk of physical harm. *Sawyer Bros,* 887 F.3d at 38. Accordingly, the Court GRANTS the Defendants' Motion for Summary Judgment on Ms. Doe's NIED claim (Count III).

### E. Equal Protection Violation

Lastly, Ms. Doe asserts a claim under 42 U.S.C. § 1983, alleging that the Defendants violated her Fourteenth Amendment right to equal protection under the law, arguing that the Defendants treated her disparately due to her gender and age

---

[12] This "physical impact" refers *not* to the physical symptomology that may accompany a serious emotional injury but a "*contemporaneously sustained . . .* physical impact (no matter how slight) or injury due to the defendant's conduct." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 547 (1994) (emphasis added).

when failing to conduct a meaningful investigation into her allegations of sexual and workplace harassment. ECF No. 24-5 at 10. The Equal Protect Clause of the Fourteenth Amendment "requires all persons similarly situated be treated alike." *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 10 (1st Cir. 2013) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "To succeed on a § 1983 equal protection claim, the plaintiffs must prove that the defendants acted in a discriminatory manner and that the discrimination was intentional." *Lopera v. Town of Coventry*, 652 F. Supp. 2d 203, 217 (D.R.I. 2009), *aff'd*, 640 F.3d 388 (1st Cir. 2011) (citations omitted). To prove as such, the plaintiff is required to show that the defendant intended to treat her differently from others who are similarly situated. *Id.* (citing *In re Subpoena to Witzel*, 531 F.3d 113, 118–19 (1st Cir. 2008)). "A discriminatory intent or purpose means that the defendants 'selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Id.* (quoting *Witzel*, 531 F.3d at 119.)

Here, Ms. Doe has not put for sufficient evidence to allow a reasonable jury to find that the Defendants' conduct was motived by gender or age-related animus. She does not set forth any facts illustrating that the Defendants treated her differently than other similarly situated men or persons belonging to a different age group. Rather, Ms. Doe supports her claim with conclusory allegations and speculation that the Defendant approached the investigation of her complaints with a discriminatory motive. But Ms. Doe cannot rely on mere "rank speculation" and "conclusory allegations" to satisfy her nonmovant burden at the summary judgment stage.

*Theidon*, 948 F.3d at 494.  Thus, Ms. Doe's § 1983 claim fails as a matter of law and the Court GRANTS the Defendants' Motion for Summary Judgment on that issue (Count V).

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS the Defendants' Motion for Summary Judgment on all counts.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

January 13, 2025